IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LYNDA ANN PERRY,**                              Case No. 1:16 CV 1848

      Plaintiff,

      v.                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                             MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Lynda Ann Perry ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner"), seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") pursuant to 42 U.S.C. § 405(g). (Doc. 1). The parties consented to the jurisdiction of the undersigned in accordance with 28 U.S.C. § 636(c) and Local Rule 72.2(b)(1). (Doc. 16). For the following reasons, the Court affirms the Commissioner's decision.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB in September 2012, alleging disability as of September 24, 2012.[1] (Tr. 116). The Social Security Administration denied the claim initially and upon reconsideration. (Tr. 77, 81). Plaintiff then filed a request for an administrative hearing and, on November 21, 2014, an administrative law judge ("ALJ") conducted a hearing. (Tr. 30-54).

---

1. The Commissioner points out the ALJ, in his written decision, incorrectly states Plaintiff alleged an onset date of April 1, 2014. (Tr. 15). Plaintiff's alleged onset date of September 24, 2012, is incorrectly listed as the date the application was filed. *Id.* Plaintiff does not allege prejudicial error from this apparently incorrect date and, even so, it is clear from the record the ALJ considered evidence starting with 2012. *See* Tr. 19-23, 26-29.

Following the hearing, at which Plaintiff (represented by counsel), and a vocational expert ("VE") testified, the ALJ issued an unfavorable decision. (Tr. 15-25). This decision became final when the Appeals Council denied Plaintiff's request for review. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff now seeks judicial review. (Doc. 1).

**FACTUAL BACKGROUND**

<u>Personal Background</u>

Plaintiff's birth date is November 1, 1966, and she was 45 years old on the alleged onset date of disability. (Tr. 55). She completed ninth grade and has past work experience as a nursing assistant. (Tr. 61-62); *see also* Tr. 33 (testimony that Plaintiff did not complete tenth grade).

<u>Administrative Hearing</u>

*Plaintiff's Testimony*

Plaintiff was 48 years old on the hearing date. (Tr. 33). She testified that since 1997 she had worked as a nursing assistant. *Id.* She stated she had coronary artery spasms, a pacemaker, H. Pylori, obstructive sleep apnea, and severe arthritis in her left shoulder that prevented her from holding her hand over her head. (Tr. 33-34). She testified she quit smoking cigarettes in 2011 (Tr. 37), and had lost 40 pounds in the nine months prior to the hearing (Tr. 38).

She testified the CPAP machine for her obstructive sleep apnea "d[id] its job", but added "in the last couple of years it just really doesn't make a difference anymore." (Tr. 34). With regard to her shoulder pain, she stated she was not undergoing physical or occupational therapy, but had received a cortisone shot and the orthopedic surgeon recommended surgery. (Tr. 35). When ask whether she could "put [her] left arm out and bring something to [her]", she responded, "[n]ot all the way." *Id.* For her coronary artery spasms, she took "a lot of channel blockers and beta blockers and everything to kind of help with the pain []", but it did not help. *Id.* Plaintiff noted she had an

"attack", resulting in debilitating pain, every day, and sometimes twice a day. (Tr. 35, 39). During these "attacks" she had difficulty breathing and would fall to the floor. (Tr. 41). She added, "nitro[glycerin] helps, but once I take the nitro[glycerin], the pain goes away, but then I'm exhausted for about three or four hours . . . and have a real bad . . . nitro[glycerin] headache –". (Tr. 36; *see also* Tr. 39). She stated a pacemaker was implanted to help to increase her heart rate, which was lowered by her medications. (Tr. 36).

On an average day, Plaintiff would prepare a "light" breakfast for her husband and then go back to bed. *Id.* She would then get back up around 10:00 a.m. and "come downstairs, drink coffee, fiddle around a little bit, watch TV, and get [herself] a bite of lunch and watch more TV." (Tr. 36-37). She estimated she could sit for a couple of hours at a time and would then need to get up and move around due to swelling her legs and feet. (Tr. 37, 41). She ran the vacuum cleaner "maybe once a week" and her husband did the laundry because she was unable to use the stairs down to the basement. (Tr. 37). She also enjoyed watching her grandchildren play, but could not "play with them too much anymore" because should would get short of breath. (Tr. 38, 41). Plaintiff did not go out alone for fear she would have an "attack". (Tr. 40).

Plaintiff testified her cardiologist, Frederick A. Heupler, M.D., advised her to stop working in 2010, but after her disability claim was denied, she continued working until September 23, 2012. (Tr. 39-40). She stopped working because she was unable to work four hours without having an "attack" and would get sent home or to the hospital. (Tr. 40).

*VE's Testimony*

The ALJ presented the VE with two hypothetical scenarios. The first had the following limitations:

> The first hypothetical person is female, 48 years of age, less than a high school education, same work background as [Plaintiff]. This person can lift/carry 20

pounds occasionally, 10 pounds frequently; can stand/walk six out of eight, can sit six out of eight, two hours at a time. With regard to push/pull, never with the left, frequently with the right; foot pedal constant.

This person can occasionally use a ramp or stairs, never a ladder, rope or a scaffold; can constantly balance; constantly stoop, kneel and crouch, but only occasionally crawl. With regard to reaching, and this is reaching overhead, none with the left, frequent with the right; parallel to the floor, occasional with the left, frequent with the right; handling, fingering, and feeling are all constant.

Visual capabilities and communication skills have no limits, they're all constant. This person should avoid high concentrations of heat, cold, smoke, fumes, dust, and pollutants. As I said, that's in high concentrations. And should avoid entirely dangerous machinery and unprotected heights. And that's it.

(Tr. 43-44).

The VE determined the individual could not perform Plaintiff's past work, but could perform the positions of Cashier II, Merchandise Marker, and Information Clerk. (Tr. 44-45).

The second hypothetical was the same as the first, except that the individual could: lift or carry ten pounds occasionally and up to ten pounds frequently; stand or walk for two out of eight hours in an eight-hour workday; and sit for six out of eight hours in an eight-hour workday, two hours at a time. (Tr. 45). The VE determined the individual could perform the jobs of Document Preparer, Order Clerk, and Table Worker. (Tr. 45).

ALJ Decision

In a written decision dated January 28, 2015, an ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since April 1, 2014, the alleged onset date.[2]

---

2. As noted above, this date appears to be an error. Plaintiff's alleged onset date of disability is September 24, 2012. (Tr. 55).

3. The claimant has the following severe impairments: coronary artery spasms, angina, bradycardia, status post pacemaker implantation, osteoarthritis of the left shoulder, H. Pylori, sleep related breathing disorder and obesity.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she is limited to lifting and/or carrying 10 pounds occasionally and up to 10 pounds frequently. She can stand and/or walk 2 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday, 2 hours at a time. The claimant can never push/pull with the left upper extremity but can do so frequently with the right upper extremity. She can constantly operate foot pedals with the lower extremities. The claimant can never climb ladders, ropes or scaffolds, but can occasionally climb ramps or stairs. She can constantly balance, stoop, kneel and crouch but only occasionally crawl. She can never reach overhead with the left upper extremity but can frequently do so with the right. The claimant can reach parallel to the floor occasionally with the left upper extremity but frequently with the right upper extremity. The claimant can constantly handle, finger and feel with the bilateral upper extremities. She has no limits with respect to visual capabilities and communication skills. The claimant must avoid concentrations of heat, cold, smoke, fumes, dust and pollutants. She must avoid entirely dangerous machines and unprotected heights.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on November 1, 1966 and was 47 [sic][3] years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.

8. The claimant has a limited education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

---

3. It appears this is also incorrect. Plaintiff was 45 years old on September 24, 2012, her alleged disability onset date. *See* Tr. 55.

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2014,[4] through the date of this decision.

(Tr. 12-25) (internal citations omitted).

Relevant Physical Medical Evidence[5]

A December 2009 stress test revealed "[t]he ergonovine test for coronary artery spasm is positive" and that Plaintiff had one artery with 80% obstruction and one with 99%. (Tr. 175). Cardiologist Frederick A. Heupler, M.D., began treating Plaintiff with high doses of calcium-channel blockers. *Id.* The record reveals Plaintiff made numerous complaints of angina, usually lasting a few minutes, sometimes up to fifteen minutes, usually relieved by nitroglycerin. (Tr. 171, 175, 184, 190, 214, 227, 412, 419, 618, 630).

In April 2011, Plaintiff complained of increasing chest pain ("Over the several days, has had 2-3 episodes requiring nitroglycerin []"), which was relieved by nitroglycerin with "some residual chest pressure." (Tr. 412). She also reported about one episode of stabbing pain every 2-3 weeks, lasting for "minutes". *Id.* Plaintiff was admitted to the hospital, and later discharged after medication adjustments resulted in her being pain-free for two days. (Tr. 412-13).

Plaintiff had an appointment with Dr. Heupler in October 2011, for cardiac evaluation. (Tr. 183). Her chest pain was "resolved on amlodipine, verapamil, and diltiazem". *Id.* She was "tolerating" increased doses of diltiazem, but reported headaches. *Id.* An EKG was "not changed" from a prior EKG in April 2011, and nitroglycerin relived Plaintiff's pain "completely". (Tr. 184).

---

4. Once again, this date is incorrect. Plaintiff alleged disability as of September 24, 2012. (Tr. 55).
5. Exhibits 23F and 24F (Tr. 639-45) were submitted for the first time to the Appeals Council. Because they were not before the ALJ, the Court does not consider them herein. When the Appeals Council declines to review an ALJ's decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).

Dr. Heupler assessed Plaintiff with: (1) "ASHD with mild coronary obstructions"; (2) "[s]ymptomatic coronary artery spasm with no EKG changes, unresponsive to large dose calcium blocker therapy"; and (3) hyperlipidemia. (Tr. 185).

Later in October 2011, Plaintiff saw Dr. Mina Chung, M.D., complaining of chest pain, "usually" relieved by nitroglycerin, fatigue, and shortness of breath. (Tr. 618). A physical examination revealed a regular heart rate and rhythm. (Tr. 620).

Plaintiff saw Dr. Heupler in December 2011, complaining of daily angina, but adding she was "definitely doing better" after an increase in amlodipine dose. (Tr. 189-91). Plaintiff described shooting and "clenching" pain, "always relieved by one [nitroglycerin] within 5 minutes." (Tr. 190).

Plaintiff was hospitalized the following month, in January 2012, due to increased chest pain after reducing her amlodipine dose because of swelling. (Tr. 195-96). Her pain decreased after the dose was increased, *id.*, and she was discharged with a diagnosis of chronic stable angina (Tr. 199).

In March 2012, Plaintiff had a follow-up appointment for her chest pain. (Tr. 211). Her daily pain was "partially controlled with large dose calcium blockers". (Tr. 214). Dr. Heupler noted Plaintiff's pain was "usually relieved by [nitroglycerin] in [a] few minutes". *Id.*

Plaintiff went to the emergency room in April 2012, complaining of increased sharp chest pain, which was improved with nitroglycerin. (Tr. 227). Prior to that, her condition was noted to be "fairly well-controlled over the past [two] months". *Id.* Her medication was adjusted and she was observed overnight. (Tr. 228-29).

Plaintiff had a negative ergonovine test for coronary spasm in August 2012. (Tr. 177, 428-29). The purpose of the test "was to see if her chest pain is likely to be due to coronary spasm, in

spite of the calcium blocker therapy." (Tr. 177). She had normal coronary arteries, and was negative for chest pain/discomfort. (Tr. 177, 428-29). Because the test was negative, Plaintiff was advised to "explore GI source of chest discomfort, especially[] in view of her history of H. Pylori, gastritis, and esophagitis unresponsive to therapy." *Id.* She was started on Nexium. (Tr. 177, 428-29). Dr. Heupler noted Plaintiff's H. Pylori was the likely cause of her recent chest pain. (Tr. 428).

Also in August 2012, Plaintiff had a follow-up visit. (Tr. 171). Dr. Heupler noted "[nitroglycerin] always relieves [Plaintiff's] chest pain", which "last[ed] for a few minutes, up to 10 to 15 minutes." *Id.* At an appointment in November 2012, it was again noted Plaintiff's chest pain "relieved with nitroglycerin in minutes" but she "occasionally require[d] two nitroglycerin." (Tr. 419).

Plaintiff was admitted to the hospital from December 29, 2012, to January 5, 2013, for chest pain. (Tr. 449-53). During that time, she had a pacemaker implanted. (Tr. 450).

In February 2013, a follow-up appointment, Plaintiff complained of "sharp pokes" in her chest "possibly related to position [of the pacemaker], not particularly to exertion", and "tightness" in her chest near the pacemaker. (Tr. 502). Santosh S. Oommen, M.D., decreased the pacemaker output and believed the sharp pains in her chest were "related to the tie-down of the suture sleeves []" and would continue to improve with time. *Id.*

Plaintiff was again admitted to the hospital from March 14 to 16, 2013, with "severe chest pain with known [c]oronary spasm". (Tr. 536). She stated the pain was 10/10 and "felt like a[n] elephant was sitting on her chest". (Tr. 537). An EKG did "not seem to be to[o] different from some other EKG's she has had in the past". (Tr. 538). Her medication doses were increased and she was discharged with no pain. (Tr. 511, 538). At a follow-up appointment on March 21, 2013, Dr. Heupler noted that she had remained angina-free following her discharge from the hospital.

(Tr. 511-12). Dr. Heupler noted: "now, her angina appears well controlled with high-dose calcium blocker therapy". (Tr. 514).

Plaintiff underwent a stress echocardiogram test in June 2014. (Tr. 612). The test was non-diagnostic because it was terminated at 6.0 METs due to complaints of shortness of breath. *Id.* It revealed normal sinus rhythm during stress, normal ST segment response to stress, normal left and right ventricular size and function, and an ejection fraction of 68% +/- 5%. (Tr. 614). ST abnormalities were present at rest. *Id.* Plaintiff's functional capacity was 4.3 METs. (Tr. 601).

On November 3, 2014, Plaintiff had a follow-up appointment with Dr. Heupler. (Tr. 630). He noted that while Plaintiff "continued having her angina on a daily basis, it responds to [nitroglycerin] []" and "goes away rapidly". *Id.* He also noted that an increase in pacemaker rate had "helped with [Plaintiff's] physical activity." *Id.* Dr. Heupler's impression was:

1. Resistant coronary artery spasm, on maximal medical therapy now; It may be that her chronic H. Pylori infection is triggering and aggravating her coronary spasm; she has daily angina at rest, responds to [nitroglycerin]. I have advised her not to return to work, which seems to aggravate her chest pain.
2. Drug-resistant H. Pylori; I discussed this with Dr. Brizendine recently[.]
3. Chronotropic Incompetence with exertional dyspnea; symptoms improved since her pacemaker rate is increased.

(Tr. 633).

*State Agency Reviewers*

On November 19, 2012, state agency reviewing physician, Maureen Gallagher, D.O., M.P.H., determined Plaintiff could occasionally lift/carry twenty pounds; frequently lift/carry ten pounds; stand/walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; was unlimited with regard to pushing/pulling; and was unlimited with regard to postural limitations, except that she could never climb ladders, ropes, or scaffolds. (Tr. 60). Dr.

Gallagher considered Listing 4.04, but ultimately determined Plaintiff could perform a limited range of light work. (Tr. 58, 60-61).

A second state agency physician, James Cacchillo, D.O., reviewed the record on June 6, 2013, and made identical findings, except that he concluded Plaintiff could frequently climb ramps/stairs and occasionally crawl. (Tr. 70-72).

*Dr. Heupler's Letters*[6]

Dr. Heupler drafted a letter on June 21, 2013, in which he stated:

[Plaintiff] is a patient with intractable coronary artery spasm that I have been following in our outpatient department at the Cleveland Clinic. In spite of maximal medical therapy, she has been severely incapacitated and unable to work because of recurrent chest pain. I recommend that she should be on permanent disability because of her intractable coronary spasm.

In the past six months, Mrs. Perry had a permanent pacemaker inserted for bradycardia, but her symptoms persist.

(Tr. 542).

In a second letter, dated November 5, 2014, Dr. Heupler stated:

I evaluated [Plaintiff] here again in our outpatient department on November 3, 2014.

She is a patient with intractable coronary artery spasm that I have been following in our Department of Cardiovascular Medicine here at the Cleveland Clinic. In spite of maximal medical therapy, she has been severely incapacitated and unable to work because of recurrent angina. I recommend that she should be on permanent disability because of her intractable coronary spasm and unstable angina.

She also has had a permanent pacemaker inserted for bradycardia, but her symptoms persist.

(Tr. 578).

---

6. After the administrative hearing, Dr. Heupler offered another opinion in a letter dated March 12, 2015. (Tr. 639-40). However, this opinion was not before the ALJ and, as such, the Court does not consider it herein.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.     Was claimant engaged in a substantial gainful activity?

2.     Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's RFC and can claimant perform past relevant work?

5.     Can claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred: (1) in his credibility determination; (2) by failing to give a treating physician opinion controlling weight; and (3) by finding Plaintiff did not meet Listing 4.04 for variant angina. (Doc. 17, at 5-10). The Commissioner responds the ALJ's decision was supported by substantial evidence and should be affirmed. (Doc. 21, at 6-16). For the reasons discussed herein, the Court agrees with the Commissioner.

<u>Credibility Assessment</u>

Plaintiff first argues the ALJ erred in his credibility assessment and determination by failing to "adequately consider the entire record", specifically by: (1) "miscontru[ing] the cause of [Plaintiff]'s post-attack exhaustion as being due to the side effects of nitroglycerin"; (2) considering Plaintiff's statement that an increase in her pacemaker rate resulted in increased

physical activity; and (3) improperly considering the effect of Plaintiff's ability to perform daily activities. (Doc. 17, at 5). The Commissioner responds: (1) substantial evidence supports the ALJ's determination Plaintiff could perform sedentary work because medication controlled her symptoms; (2) the ALJ reasonably considered the effect of Plaintiff's pacemaker; and (3) the ALJ appropriately considered Plaintiff's daily activities. (Doc. 21, at 6-16)

When making a credibility finding, the ALJ must make a finding based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. But, an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1.

With regard to a claimant's subjective symptoms, the regulations require an ALJ to consider certain factors, including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *7 ("[i]n addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) . . . ."); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR 404.1529(c) . . . describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition

to the objective medical evidence when assessing the credibility of an individual's statements").[7]

Although the ALJ must "consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *Roberts v. Astrue*, 2010 WL 2342492, at *11 (N.D. Ohio).

Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all

---

7. The undersigned notes Plaintiff references SSR 16-3p, 2016 WL 1119029, and the Commissioner references both SSR 16-3p and SSR 96-7p, 1996 WL 374186. The former supersedes the latter, however, its effective date in March 2016 post-dates the ALJ's January 2015 decision. Neither party directly addresses the issue of whether SSR 16-3p should be applied retroactively. District courts within this Circuit have disagreed regarding the retroactivity of SSR 16-3p and the Sixth Circuit has not decided the issue.

Those courts applying SSR 16-3p retroactively have relied on the fact that SSR 16-3p's purpose was clarification, rather than change. *See, e.g., Sypolt v. Berryhill*, 2017 WL 1169706, at n.4 (N.D. Ohio) (applying SSR 16-3p retroactively). Those courts declining to apply SSR 16-3p retroactively have relied upon prior Sixth Circuit statements regarding retroactivity in social security cases. *See, e.g., Murphy v. Comm'r of Soc. Sec.*, 2016 WL 2901746, at n. 6 (E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively) (citing, *inter alia, Cruse v Comm'r of Soc. Sec.*, 502 F.3d 532, 541-42 (6th Cir. 2007) ("We are not aware of any constitutional or statutory requirement that the Administration apply its [newly effective] policy interpretation rulings to appeals then-pending in federal courts, absent, of course, ex post factor or due process concerns not present here."); *Combs v. Comm'r Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) ("The [Social Security] Act does not generally give the SSA the power to promulgate retroactive regulations.")).

The Sixth Circuit, while declining to reach the retroactivity issue, has characterized SSR 16–3p as merely eliminating "the use of the word 'credibility' . . . to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). The undersigned finds it unnecessary to decide this issue, as it is "largely academic here" *Goddard v. Berryhill*, 2017 WL 2190661, at *20 (N.D. Ohio). Both SSR 16-3p and 96-7p refer to the two-step process described above, and the factors listed in 20 C.F.R § 404.1529(c). In any event, the Court's evaluation of Plaintiff's credibility argument herein would be the same applying either SSR 16-3p or SSR 96-7p.

of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully supported, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

Here, the ALJ appropriately explained the two-step process for evaluating symptoms. (Tr. 19) (citing 20 C.F.R. § 404.1529). He determined Plaintiff's impairments could reasonably be expected to cause her symptoms, but that her statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible". (Tr. 19).

First, the Court finds the ALJ appropriately considered the extent Plaintiff's symptoms were side effects of her prescription medication. The ALJ noted:

> The claimant testified that she has coronary artery spasms for which she takes Nitroglycerin. She testified that the medication makes the pain go away but that she is exhausted for 3-4 hours. However, when she saw Dr. Heupler in November 2014, she did not endorse fatigue or exhaustion secondary to the nitroglycerin. She reported that the angina responds to the nitroglycerin and rapidly goes away but mentioned no side effects.

(Tr. 23) (citing Tr. 630).

Indeed, at the hearing Plaintiff testified nitroglycerin relieved her pain, but caused exhaustion. (Tr. 36) ("And the nitro[glycerin] helps, but once I take the nitro[glycerin] the pain goes away, but then I'm exhausted for about three or four hours, and have a real bad, you know, nitro[glycerin] headache and - -".). However, at a follow-up appointment with Dr. Heupler in November 2014, she did not mention any side effects caused by her medication. He noted that since Plaintiff's last appointment in July 2014, "she has continued having her angina on a daily basis, it responds to [nitroglycerin]. Her angina goes away rapidly with the [nitroglycerin]." (Tr. 630). Pursuant to 20 C.F.R. § 404.1529(c)(iv), an ALJ should consider "[t]he type, dosage, effectiveness, and side effects of any medication [a claimant] take[s] or have taken to alleviate [the claimant's] pain or other symptoms". Thus, the ALJ did not err in discussing and considering the side effects of Plaintiff's medication in his subjective complaint analysis.

Plaintiff, however, asserts her exhaustion and pain were related to the angina, rather than the medication used to treat, citing a November 2011 treatment note in which she stated a headache caused by the nitroglycerin was more bearable than the chest pain itself. (Tr. 183). Regardless of the source of the pain, Plaintiff's cite to one instance of a subjective report of chest pain in the record from 2011, does not show error in the credibility determination. Moreover, Plaintiff fails to show how the record supports her subjective complaints of disabling chest pain.

In fact, substantial evidence in the record supports the ALJ's determination that Plaintiff could perform sedentary work. *See* Tr. 184 (November 2011 treatment note showing a resolution of Plaintiff's chest pain with nitroglycerin); Tr. 412 (April 2011 emergency room record showing Plaintiff's chest pain was relieved by nitroglycerin, with "some residual chest pressure"); Tr. 175 (August 2012 treatment note stating Plaintiff's "angina subsided after intracoronary [nitroglycerin] and she had "no further angina pain with increase in Norvasc"); Tr. 171 (August 2012 treatment

note stating Plaintiff's pain lasted "for a few minutes, up to 10 to 15 minutes" and that nitroglycerin "always relieves her chest pain"); Tr. 190-91 (December 2011 treatment note in which Plaintiff stated nitroglycerin "always relived" chest pain "within [five] minutes" and reported she was doing better after a medication increase); Tr. 195-96 (January 2012 emergency room note showing decreased chest pain with medication increase); Tr. 227 (April 2012 record noting Plaintiff's condition had been "fairly well-controlled over the past two months"); Tr. 511-14 (March 2013 treatment note stating Plaintiff's chest pain was resolved with a medication adjustment and her chest pain was now "well controlled with high-dose calcium blocker therapy"); Tr. 618 (October 2014 record stating nitroglycerin "usually relieves the pain well"); Tr. 630 (November 2014 record showing Plaintiff's pain was "rapidly" resolved with nitroglycerin"). There are also instances in the record of more significant chest pain, but it was usually resolved with two doses of nitroglycerin (Tr. 214, 419). But, even so, if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Second, the ALJ did not err in considering the effect of Plaintiff's pacemaker on her physical activity and, thus, her RFC. Indeed, the record reveals Plaintiff's physical activity improved following an increase in the pacemaker rate. (Tr. 630). A treatment note dated November 3, 2014, from Dr. Heupler states: "Dr. Chung increased the pacemaker rate past week [sic], and this helped with her physical activity." *Id.* A physical examination revealed trace edema, but a full range of motion. (Tr. 632).

Plaintiff is correct that "improvement in functioning does not necessarily indicate normal function" (Doc. 17 at 6), but, as the Commissioner points out, the ALJ did not find Plaintiff had normal function, but rather that she was limited to a less than full range of sedentary work (Doc.

21, at 12). *See* SSR 96-9p ("An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare."). Thus, the Court finds the ALJ appropriately considered the effect of Plaintiff's pacemaker and appropriately considered the effect of her limitations in the RFC determination.

Third, the ALJ appropriately considered Plaintiff's daily activities in his evaluation of her subjective systems. The ALJ noted:

> [T]he claimant's activities of daily living do not support a finding of disability. The claimant cares for her own grooming. She makes breakfast for her husband before he goes to work. She makes a light lunch for herself. The claimant watches television and runs the vacuum weekly. She makes a light dinner. Furthermore, she goes out when accompanied.

(Tr. 23).

Assessment of a claimant's daily activities is a factor an ALJ should consider when evaluating the claimant's subjective complaints. 20 C.F.R. § 404.1529(c)(3). Here, the ALJ appropriately considered Plaintiff's daily activities and concluded they were not consistent with a finding of disability. These activities are consistent with an ability to perform sedentary work which requires "the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools." SSR 96-9p, 1996 WL 374185, at *3. Thus, the ALJ's assessment is not in error.

Therefore, the undersigned finds the ALJ's credibility determination reasonable and supported by substantial evidence in the record. It is, therefore, "accorded great weight and deference." *Workman*, 105 F. App'x at 800-01 (citing *Walters*, 127 F.3d at 531).

<u>Treating Physician Rule</u>

Plaintiff next argues the ALJ erred in his evaluation of the Dr. Heupler's opinion by failing to provide "good reasons" for giving it less than controlling weight. (Doc. 17, at 7- 9). Defendant

responds that Dr. Heupler's statements do not qualify as "medical opinions" under the regulations. (Doc. 21, at 11-12).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of

the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009); *see also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (holding ALJ adequately addressed opinion by indirectly attacking both its consistency and supportability with other record evidence).

Here, Dr. Heupler offered opinions regarding Plaintiff's impairments in two letters dated June 21, 2013 (Tr. 542), and November 5, 2014 (Tr. 578) (following a November 3, 2014 appointment, *see* Tr. 630-38).

In the June 21, 2013, letter, Dr. Heupler stated:

Lynda Perry is a patient with intractable coronary artery spasm that I have been following in our outpatient department at the Cleveland Clinic. In spite of maximal medical therapy, she has been severely incapacitated and unable to work because of recurrent chest pain. I recommend that she should be on permanent disability because of her intractable coronary spasm.

In the past six months, Mrs. Perry had a permanent pacemaker inserted for bradycardia, but her symptoms persist.

(Tr. 542).

In the November 5, 2014, letter, Dr. Heupler stated:

I evaluated Mrs. Lynda Perry here again in our outpatient department on November 3, 2014.

She is a patient with intractable coronary artery spasm that I have been following in our Department of Cardiovascular Medicine here at the Cleveland Clinic. In spite of maximal medical therapy, she has been severely incapacitated and unable to work because of recurrent angina. I recommend that she should be on permanent disability because of her intractable coronary spasm and unstable angina.

She also has had a permanent pacemaker inserted for bradycardia, but her symptoms persist.

(Tr. 578).

The ALJ considered these opinions of Dr. Heupler, but gave them little weight:

I have also considered the opinions of Dr. Heupler rendered on June 21, 2013, November 3, 2014 and November 5, 2014, but gives [sic] them little weight [citing Tr. 543, 578, 633]. He opined that the claimant should be on permanent disability because of her intractable coronary spasms and unstable angina. The first issue to be addressed is that a finding that an individual is or is not disabled is a finding reserved to the Commissioner pursuant to the regulations. Next, the doctor opined that the claimant should be found disabled, in part, due to the unstable angina. However, he noted in March 2013, that the angina was well controlled with high-dose calcium blocker therapy (Exhibit 1 1 F :26). Moreover, his clinical notes from November 3, 2014, indicate the angina responds to nitroglycerin and rapidly goes away (Exhibit 22F:2). Dr. Heupler wrote that the claimant has a permanent pacemaker inserted for her bradycardia, but her symptoms persist (Exhibit l2F:2, 14F:2). However, he does not specify what symptoms continue to persist. When the claimant saw the doctor, after the pacemaker had been adjusted, she had dyspnea on exertion with walking one flight of stairs. I have accounted for this in the residual functional capacity by limiting her to climbing ramps or stairs only occasionally. She does not have angina when climbing stairs (Exhibit 22F:2). Furthermore, physical examination revealed only trace edema in the lower extremities (Exhibit 22F:4). Moreover, the claimant reported that increasing the pacemaker rate helped with physical activity (Exhibit 22F:2). As such, I give little weight to the doctor's opinions.

(Tr. 22-23).

First, the ALJ appropriately discounted Dr. Heupler's comments regarding Plaintiff's disability status. Medical opinions are statements from physicians regarding the severity of an individual's impairments and the most that individual can still do despite the impairments, including any potential restrictions. 20 C.F.R. § 404.1527(a). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine you are disabled." § 404.1527(d). Rather, these opinions are issues reserved to the Commissioner and an ALJ is not required to give these opinions controlling weight or special significance. *Id.*; *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work

determinations belongs to the Commissioner."). Because the disability determination is specifically reserved for the Commissioner, Dr. Heupler's statements regarding Plaintiff's ability to work do not qualify as "medical opinions" and the ALJ was not required to give them controlling weight. Furthermore, it is arguable that the letters do not even qualify as medical opinions because they do not discuss functional limitations, see 20 C.F.R. § 404.1527(a)(2), and are therefore not entitled to deference by the ALJ, *see Allen*, 561 F.3d at 651 n.3 (noting that statements that do not address the specific extent of limitations "appear to be outside the scope of 'medical opinions' as defined in 20 C.F.R. § 404.1527(a)(2)").

Second, the ALJ appropriately discounted Dr. Heupler's opinions because medical evidence shows Plaintiff's angina was well-controlled with medication and treatment. Indeed, treatment notes reveal Plaintiff's angina was well-controlled with a high-dose calcium blocker therapy, (Tr. 514) (March 2013 treatment note), and rapidly resolved with nitroglycerin, *see, e.g.*, (Tr. 630) (November 2014 treatment note). Although Plaintiff points to contradictory evidence in the record, as noted above, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Third, the ALJ noted that to the extent Plaintiff's persisting symptoms interfere with her ability to perform work functions, he accounted for the limitations in his RFC determination. He mentioned that even after Plaintiff's pacemaker was adjusted, she experienced dyspnea, but not angina, when climbing a flight of stairs (Tr. 22) (citing Tr. 630); had only trace edema in her lower extremities (Tr. 22) (citing Tr. 632); and had increased physical activity after the pacemaker rate was increased (Tr. 22-23) (Tr. 630). The ALJ stated he accounted for these identified limitations by limiting her to only occasional climbing of ramps and stairs. (Tr. 22); *see also* Tr. 18 (RFC

determination noting Plaintiff can occasionally climb ramps or stairs). Furthermore, the ALJ noted that while Dr. Heupler stated Plaintiff's symptoms persisted after she received a permanent pacemaker, he failed to specifically explain which symptoms persisted and any functional limitations they caused. Importantly, ALJs are only required to give deference to medical opinions, which discuss a claimant's functional limitations. 20 C.F.R. § 404.1527(a)(2); *Allen*, 561 F.3d at 651 n.3.

Overall, the ALJ's reasoning for discounting Dr. Heupler's opinions speaks to factors of supportability of the opinion and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(d)(2). The ALJ's opinion makes clear to subsequent reviewers the reasoning for assigning less than controlling weight to Dr. Heupler's opinions and, thus, satisfies the "good reasons" requirement. *Wilson*, 378 F.3d at 544. The ALJ did not erred in his treating physician analysis.

Listing 4.04

Plaintiff argues she meets the requirements for Listing 4.04 because she tested positive for coronary artery spasm and reported daily angina. (Doc. 17, at 9-10). The Commissioner responds the Listings regarding variant angina do not require a finding of disability, but rather provide guidance on evaluation of the condition. (Doc. 21, at 12-15).

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that she is disabled at Step Three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the elements are satisfied. *King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 974 (6th Cir. 1984). Moreover, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with

the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986). It

is not sufficient to come close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler,*

789 F.2d 363, 367 (6th Cir.1989) (Commissioner's decision affirmed where medical evidence

"almost establishes a disability" under Listing).

The Listings provide guidance to ALJs on how to evaluate certain medical conditions.

Section 4.00, Cardiovascular System, discusses variant angina. It states:

6. What is variant angina?

a. Variant angina (Prinzmetal's angina, vasospastic angina) refers to the occurrence
of anginal episodes at rest, especially at night, accompanied by transitory ST
segment elevation (or, at times, ST depression) on an ECG. It is due to severe spasm
of a coronary artery, causing ischemia of the heart wall, and is often accompanied
by major ventricular arrhythmias, such as ventricular tachycardia. We will consider
variant angina under 4.04 only if you have spasm of a coronary artery in relation to
an obstructive lesion of the vessel. If you have an arrhythmia as a result of variant
angina, we may consider your impairment under 4.05.

b. Variant angina may also occur in the absence of obstructive coronary disease. In
this situation, an ETT will not demonstrate ischemia. The diagnosis will be
established by showing the typical transitory ST segment changes during attacks of
pain, and the absence of obstructive lesions shown by catheterization. Treatment in
cases where there is no obstructive coronary disease is limited to medications that
reduce coronary vasospasm, such as calcium channel blockers and nitrates. In such
situations, we will consider the frequency of anginal episodes despite prescribed
treatment when evaluating your residual functional capacity.

c. Vasospasm that is catheter-induced during coronary angiography is not variant
angina.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 4.00(E)(6).

If further analysis of variant angina is necessary based on the above, Listing 4.04 provides

that a claimant's impairments must meet the following requirements.

4.04 Ischemic heart disease, with chest discomfort associated with myocardial
ischemia, as described in 4.00E3, while on a regimen of prescribed treatment (see
4.00A if there is no regimen of prescribed treatment). With one of the following:

A. Sign- or symptom-limited exercise test demonstrating at least one of the following manifestations at a workload equivalent to 5 METs or less:

1. Horizontal or downsloping depression, in the absence of digitalis glycoside therapy and/or hypokalemia, of the ST segment of at least -0.10 millivolts (-1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead (other than aVR) and that have a typical ischemic time course of development and resolution (progression of horizontal or downsloping ST depression with exercise, and persistence of depression of at least -0.10 millivolts for at least 1 minute of recovery); or

2. An upsloping ST junction depression, in the absence of digitalis glycoside therapy and/or hypokalemia, in any lead (except aVR) of at least -0.2 millivolts or more for at least 0.08 seconds after the J junction and persisting for at least 1 minute of recovery; or

3. At least 0.1 millivolt (1 mm) ST elevation above resting baseline during both exercise and 3 or more minutes of recovery in ECG leads with low R and T waves in the leads demonstrating the ST segment displacement; or

4. Failure to increase systolic pressure by 10 mmHg, or decrease in systolic pressure below usual clinical resting level (see 4.00C2b); or

5. Documented reversible radionuclide "perfusion" (thallium201 ) defect at an exercise level equivalent to 5 METs or less;

OR

B. Impaired myocardial function, documented by evidence (as outlined under 4.00C3 or 4.00C4b) of hypokinetic, akinetic, or dyskinetic myocardial free wall or septal wall motion with left ventricular ejection fraction of 30 percent or less, and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, and resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest;

OR

C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation), and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, with both 1 and 2:

1. Angiographic evidence revealing:

    a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or

    b. 70 percent or more narrowing of another nonbypassed coronary artery; or

    c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

    d. 50 percent or more narrowing of at least 2 nonbypassed coronary arteries; or

    e. Total obstruction of a bypass graft vessel; and

2. Resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 4.04.

Here, at Step Three of the analysis, the ALJ specifically considered Listing 4.04. (Tr. 17-18). He noted:

> With respect to listing 4.04, the listing requires signs or symptoms at a workload equivalent to five METS or less. However, on June 26, 2014, the claimant underwent a stress echo and while she complained of shortness of breath, she exercised at six METS. Moreover, the left and right ventricles were normal in size; she had a normal ejection fraction of 68 +/- 5%; and she had normal blood pressure response to stress and normal ST segment response to stress (Exhibit 19F:4, 5). As such, I do not find that the claimant meets the listing.

(Tr. 18).

Plaintiff first briefly argues her impairments meet the variant angina listing because she had a positive test for coronary artery spasm and experienced daily angina. (Doc. 17, at 9-10) (citing Tr. 175, 618). This argument is unavailing. The Code of Federal Regulations specifically states that if a claimant has "spasm of a coronary artery in relation to an obstructive lesion of the vessel", then Listing 4.04 will be considered. The ALJ did just that, and clearly found evaluation under Listing 4.04 appropriate. *See* Tr. 18 (evaluating Listing 4.04). In her merits brief, Plaintiff fails to explain how the ALJ's analysis was incorrect, and how she meets the specific requirements

of the Listing. It is Plaintiff's burden to show she meets a Listing, *Landsaw,* 803 F.2d at 214, and she fails to do so in her merits brief.[8]

However, in her reply brief, in response to the Commissioner's argument, Plaintiff presents evidence purporting to show she does indeed meet the requirements of the Listing. *See* Doc. 24, at 1-5; *see also United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) (arguments made for the first time in a reply brief will be considered if they are responsive arguments). Plaintiff argues she met Listing 4.04(B), requiring three separate ischemic episodes, because she was diagnosed with variant angina through a positive coronary artery spasm test in 2009. (Doc. 24, at 1-2). However, "a diagnosis alone is not the same as an opinion that an individual has met the degree of severity required for the condition to be presumed to be disabling under a Listing." *Guthrie v. Astrue*, 2011 U.S. Dist. LEXIS 154291, at *14 (S.D. Ohio) (citing *Young v. Sec. of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990)); *Varley*, 820 F.2d at 780. Importantly, while Plaintiff states her impairments meet 4.04(B) because she has "had a great deal more than the three required separate ischemic episodes within a 12 month period" which are "not amenable to revascularization", she does not cite to record evidence supporting this assertion. (Doc. 24, at 3). She, therefore, has not met her burden to show three episodes pursuant to 4.04(B).

---

8. Plaintiff attaches her subsequent award of benefits to her merits brief. *See* Doc. 17-1. However, eligibility for DIB must be established during the relevant time period. *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Because Plaintiff does not specifically request a sentence six remand, or effectively demonstrate how this evidence is either "new" or "material", other than to state the evidence contained within justifies a more restrictive RFC, the Court finds it unnecessary to discuss. Plaintiff waives underdeveloped arguments. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) and, even so, a subsequent favorable decision alone does not qualify as new and material evidence, *Allen*, 561 F.3d at 653; *see also Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial.").

Furthermore, the ALJ found test results in the record revealed Plaintiff's impairments did not meet the requirements of 4.04(A). Plaintiff addresses this finding by stating that "when she is not having an angina attack, her coronary arteries are normal" (Doc. 24, at 3), thus, implying the ALJ should have considered her medication regime. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 4.00(E)(6)(b) ("Treatment in cases where there is no obstructive coronary disease is limited to medications that reduce coronary vasospasm, such as calcium channel blockers and nitrates. In such situations, we will consider the frequency of anginal episodes despite prescribed treatment when evaluating your residual functional capacity."). This argument is not persuasive because the ALJ did consider Plaintiff's prescribed treatment, included medication, and its effect on her impairments in formulating his RFC. *See* Tr. 18-23 (thoroughly analyzing the evidence and concluding, "the above residual functional capacity assessment is supported by objective medical evidence of record and takes into consideration the opinion evidence as well as the claimant's testimony, reports and allegations.").

Plaintiff also argues, and attaches academic articles finding, that in cases where exercise tolerance tests were "not performed with measured peak oxygen uptake", as was the case here, "estimated use of the patient's use of oxygen is often grossly incorrect." (Doc. 24, at 4). Indeed, the regulations note that "ETTs without measurement of VO[2] provide only an estimate of aerobic capacity" but provides for a mathematical equation to calculate exact amounts. *See* 20 C.F.R. Pt. 404, Subpt. P, Ap'px 1, § 4.00(C)(5). Even so, it is not appropriate for this Court to address the accuracy, or inaccuracy, of this medical test. Such analysis would constitute improper judicial fact finding, and this Court's role is simply to determine whether the ALJ's decision was supported by substantial evidence. Moreover, while Plaintiff attacks the veracity of the MET testing procedure, she fails to address how her impairment met one of the other four requirements of Listing 4.04(A).

Finally, it is unnecessary to address Listing 4.04(C) because, as the Commissioner points out, it is applicable only in cases where the claimant has not undergone an exercise tolerance test, which is not the case here. *See* Tr. 612-16 (treatment notes showing Plaintiff underwent an exercise tolerance test on June 26, 2014).  Thus, Plaintiff has not met her burden to show her impairment met or medically equaled any part Listing 4.04. The ALJ's Listing determination is supported by substantial evidence.

## CONCLUSION

Following a review of the arguments presented, the record, and the applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Commissioner's decision denying benefits is AFFIRMED.

IT IS SO ORDERED.

s/James R. Knepp II
United States Magistrate Judge
